# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #054

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **8th day of December, 2023** are as follows:

**PER CURIAM:**

*2023-B-00592*          *IN RE: J ANTONIO FLORENCE*

SUSPENSION IMPOSED. SEE PER CURIAM.

SUPREME COURT OF LOUISIANA

NO. 2023-B-0592

IN RE: J. ANTONIO FLORENCE

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, J. Antonio Florence, an attorney licensed to practice law in Louisiana.[1]

**UNDERLYING FACTS**

In January 2021, the ODC filed formal charges against respondent.[2] The formal charges alleged the following:

*The Kennon Matter*

On April 23, 2014, Beverly Kennon hired respondent to represent her son, Keddrick Kennon, in a criminal matter in Webster Parish. Respondent agreed to handle the matter for a $5,000 fixed fee, but he and Ms. Kennon did not execute a written fee agreement. Ms. Kennon paid respondent a total of $4,100. Respondent applied $2,100 of this amount to outstanding fees owed for a 2013 representation of Mr. Kennon.

---

[1] Respondent is also licensed to practice law in New Jersey.

[2] Initially, the ODC filed six counts of formal charges, but the hearing committee and the disciplinary board found no misconduct in one of the counts. The ODC accepted these findings without objection. Accordingly, this opinion does not address the misconduct in that particular count.

Respondent did not want to publicly enroll as Mr. Kennon's counsel of record because he did not have a good relationship with the district attorney. Therefore, he paid attorney Ernest Gilliam $2,000 to enroll as counsel of record during the plea negotiation stage of the case. Respondent assured Mr. Kennon and Mr. Gilliam that he would, nevertheless, appear and represent Mr. Kennon if the case proceeded to a trial. Mr. Gilliam filed and handled all pre-trial motions and court appearances in the case.

At an April 15, 2015 status conference, the judge scheduled the case for an April 27, 2015 trial. Mr. Kennon was present with only Mr. Gilliam and complained to the judge that he had hired respondent to represent him at trial. Mr. Gilliam confirmed this and advised that he expected respondent to appear at the trial to represent Mr. Kennon.

Following the status conference, Ms. Kennon sent respondent a text message asking if he intended to represent her son at the April 27, 2015 trial. In response, respondent claimed he did not represent Mr. Kennon and would not be representing him at the trial. In a follow-up text message, Ms. Kennon reminded respondent that she had already paid him to represent her son at his trial.

Respondent did not appear at Mr. Kennon's April 27, 2015 trial. However, Mr. Gilliam was present to represent Mr. Kennon. Over Mr. Kennon's objection, the judge proceeded with the trial, which resulted in a guilty verdict and a thirty-five year sentence for Mr. Kennon.

Thereafter, Mr. Kennon filed a disciplinary complaint against respondent, seeking a refund of the fees his mother paid. During the ODC's investigation, Mr. Gilliam informed the ODC that respondent had asked him to sign an affidavit, in which he would falsely state that respondent never agreed to represent Mr. Kennon. Mr. Gilliam refused to sign such an affidavit.

2

Respondent acknowledged accepting the $4,100 fee from Ms. Kennon but refused to refund any portion thereof. He also refused to refer the matter to the Louisiana State Bar Association ("LSBA") fee dispute resolution program, claiming he had earned the fee. Furthermore, respondent insisted that he never agreed to represent Mr. Kennon but simply referred the case to Mr. Gilliam.

Based on these alleged facts, the ODC charged respondent with violating Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.5(f)(5) (failure to refund an unearned fee), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct.

*The Davis Matter*

In 2016, Burney Davis was charged with a felony in Caddo Parish. Mr. Davis hired attorney Jacqueline Scott to represent him and paid her agreed-upon $8,500 fixed fee. Later, Ms. Scott was required to withdraw from the representation and asked respondent if he would take over. Both Mr. Davis and respondent agreed that respondent would represent Mr. Davis for the same $8,500 fixed fee. Ms. Scott refunded the $8,500 to Mr. Davis, who in turn used it to pay respondent.

Respondent enrolled as Mr. Davis' counsel of record on November 9, 2016. On December 8, 2016, Mr. Davis fired respondent because he could not get respondent to communicate with him. Mr. Davis then hired attorney Peter Flowers to represent him. Respondent did not refund the $8,500 fee.

Later, Mr. Davis filed a claim with the LSBA fee dispute resolution program. Respondent did not respond to the LSBA's letter requesting that he participate in the program and made no other efforts to resolve the fee dispute.

Based on these alleged facts, the ODC charged respondent with violating Rule 1.5(f)(5) of the Rules of Professional Conduct.

*The Harris Matter*

On August 16, 2016, Orya Harris hired respondent to represent her brother, Rodriqus Harris, in a criminal matter in Caddo Parish. Respondent quoted a $5,000 fixed fee to handle the representation, but no written fee agreement was executed. Ms. Harris made an initial $1,500 payment, and respondent provided her with a written invoice/receipt for the payment. Over the next several months, Ms. Harris made various payments totaling $3,100.

During 2017, respondent failed to appear at several pre-trial hearings on Mr. Harris' behalf. Consequently, Mr. Harris fired respondent and later filed a disciplinary complaint against him. In his complaint, Mr. Harris demanded that respondent withdraw from the representation and refund the fee. Respondent withdrew from the representation prior to the August 9, 2017 trial, and Mr. Harris was provided court-appointed counsel. However, respondent failed to refund the fee or otherwise attempt to resolve the fee dispute.

During his July 26, 2018 sworn statement to the ODC, respondent claimed the fixed fee was $10,000. In support of this contention, respondent provided the ODC with copies of two separate invoices, both dated January 12, 2017 and reflecting a $10,000 fixed fee, which he purportedly sent to Ms. Harris. The ODC showed respondent the November 1, 2016 invoice that indicated the fixed fee was $5,000, and he acknowledged it was genuine. However, he could provide no credible explanation for the difference in the two sets of invoices. Ms. Harris informed the ODC that she had never seen the two January 12, 2017 invoices and reiterated that the fixed fee was $5,000.

4

Based on these alleged facts, the ODC charged respondent with violating Rules 1.5(f)(5), 8.1(a) (a lawyer shall not knowingly make a false statement of material fact in connection with a disciplinary matter), and 8.4(c) of the Rules of Professional Conduct.

### *The James Matter*

On February 3, 2017, Cordero James hired respondent to represent him in a criminal matter in Caddo Parish. Pursuant to a written fee agreement, respondent charged a $6,000 fixed fee. Mr. James' family paid respondent $2,000 towards the fee.

Simultaneously, respondent agreed to represent Mr. James' co-defendant in the case. However, the co-defendant's statement to the police incriminated Mr. James, and the judge advised respondent in open court that he could not represent them both. Later, during a hearing on April 6, 2017, the judge removed respondent from both representations due to the conflict of interest. Respondent filed a motion to withdraw, which the judge granted, and Mr. James had to retain new counsel. Nevertheless, respondent did not address the issue of the unearned fee.

Based on these alleged facts, the ODC charged respondent with violating Rule 1.5(f)(5) of the Rules of Professional Conduct.

### *The Contempt of Court Matter*

During a September 12, 2017 hearing in a criminal case pending in Caddo Parish, Judge Erin Garrett repeatedly admonished respondent for making abusive and insulting comments in open court directed at the court and the assistant district attorney and for repeatedly interrupting them. During a recess in the case, Judge Garrett instructed respondent to remain outside the courtroom. Nevertheless,

respondent left the courthouse, and court personnel were unable to locate him at his office.

The following day, Judge Garrett conducted a hearing in which she charged respondent with direct contempt for (1) "contumacious" refusal to comply with her order to remain and (2) deliberately making insulting, openly contemptuous, and derogatory remarks that challenged her authority and dignity. Respondent was found guilty of direct contempt and fined $100.

Based on these alleged facts, the ODC charged respondent with violating Rule 8.4(d) of the Rules of Professional Conduct.

## DISCIPLINARY PROCEEDINGS

As stated above, the ODC filed formal charges against respondent in January 2021. Through counsel, respondent filed an answer to the formal charges, wherein he denied engaging in any misconduct. Accordingly, the matter proceeded to a formal hearing on the merits.

### Formal Hearing

The hearing committee conducted the formal hearing on June 14 and 15, 2021. Both respondent and the ODC introduced documentary evidence and called witnesses to testify before the committee. Respondent also testified on his own behalf and on cross-examination by the ODC.

### Hearing Committee Report

After consideration, the hearing committee provided an analysis of the evidence and testimony presented for each count of alleged misconduct. Based upon this analysis, the committee made factual findings and determinations of rule

violations. The committee's analysis, findings, and determinations in each count are as follows:

*The Kennon Matter*

Ms. Kennon testified that respondent had successfully represented her son previously. Therefore, she contacted him about the 2014 criminal matter. Respondent said he would take the new case for a $5,000 fee, with a $2,000 deposit, if she paid the balance due from the previous representation. In support, the ODC submitted evidence in the form of two checks representing the balance owed for the previous representation and the $2,000 deposit for the new representation. Ms. Kennon further testified that respondent never appeared in court on her son's behalf. Mr. Gilliam informed her that respondent had sent him to represent her son on preliminary matters because the district attorney did not like respondent. In support, the ODC submitted text messages between Ms. Kennon and respondent. The committee found Ms. Kennon's testimony credible.

Mr. Gilliam testified that respondent associated him to handle Mr. Kennon's pre-trial matters, and respondent would be present if the case went to trial. This testimony is supported by the transcript of an April 15, 2015 status conference in Mr. Kennon's case as well as by a motion to continue the trial filed on April 27, 2015. Mr. Gilliam also explained why he did not sign the affidavit respondent drafted.[3] Finally, he stated that, as Mr. Kennon's trial was approaching, he and respondent had a falling out regarding another matter and were not speaking on a daily basis.

Mr. Kennon testified that he believed he had hired respondent to represent him and had one or two telephone calls with respondent wherein respondent agreed

---

[3] Mr. Gilliam indicated that he did not want to sign the affidavit because he had no knowledge of some of the information stated therein. He also did not want to sign the affidavit because he thought his live testimony would be more appropriate.

to represent him in court. Nevertheless, respondent never appeared in court with Mr. Kennon. This testimony is supported by the transcript of an April 15, 2015 status conference in Mr. Kennon's case.

Respondent acknowledged speaking with both Ms. Kennon and Mr. Kennon but denied agreeing to represent Mr. Kennon. The committee found respondent's denials not credible, noting that he could not explain why he had written two receipts for the money Ms. Kennon paid him – one for the $2,000 deposit on the $5,000 fee that showed a balance due of $3,000 and one for the $2,100 payment for the previous representation that showed a balance due of zero.[4]

Based upon the testimony and evidence, the committee found that respondent accepted the fee and agreed to represent Mr. Kennon. Whether in response to Ms. Kennon's threats or to his falling out with Mr. Gilliam, respondent failed to appear in court on Mr. Kennon's behalf. Respondent knowingly and intentionally neglected Mr. Kennon's representation, leaving Mr. Gilliam to try Mr. Kennon's case. Although the outcome of the trial may not have been any different, Mr. Kennon was not represented by the attorney of his choice. Furthermore, respondent refused to refund any portion of the fee or refer the matter to the fee dispute resolution program. Respondent attempted to get Mr. Gilliam to sign an affidavit that contained facts contrary to the committee's factual findings.

Based upon these facts, the committee determined respondent violated Rules 1.3 and 1.5(f)(5) of the Rules of Professional Conduct. The committee further determined there was not clear and convincing evidence that respondent violated the Rules of Professional Conduct by seeking Mr. Gilliam's signature on the affidavit.

---

[4] Respondent testified that Mr. Gilliam had already agreed to handle Mr. Kennon's case for $5,000. Therefore, respondent cashed the $2,000 check and gave the cash to Mr. Gilliam. Then he wrote a receipt showing a balance due of $3,000.

*The Davis Matter*

Mr. Davis testified that he originally hired Ms. Scott to represent him. However, when she had to withdraw because of a conflict, she refunded the remaining $7,650 of the $8,500, and he paid respondent $7,650. Minute entries show respondent enrolled as counsel of record but was discharged less than a month later, which Mr. Davis attributed to respondent's failure to communicate. Mr. Davis also testified that, when he fired respondent, respondent told him, "You're not getting your money back" and "I'm not giving you a dime back." Mr. Davis then tried to initiate fee dispute arbitration but was unsuccessful.

Respondent lacked credibility when he inconsistently testified that he did not remember receiving an arbitration request from Mr. Davis but also called in response to said arbitration request. Respondent also admitted that he had not earned the entire fee Mr. Davis had paid him. However, he claimed that Mr. Davis asked him to apply the remaining balance to another client, which Mr. Davis denied. The committee determined respondent's credibility was further damaged by his failure to include this claim in his answer to the formal charges.

Based upon the testimony and evidence, the committee found that respondent was hired on a fixed-fee basis. When he was discharged a month later, he took no action to address the fee dispute even after Mr. Davis filed a claim with the LSBA fee dispute resolution program. The committee also found that respondent acted knowingly and intentionally. Based upon these facts, the committee determined respondent violated Rule 1.5(f)(5) of the Rules of Professional Conduct.

*The Harris Matter*

During his sworn statement, respondent produced an invoice reflecting that the fee was $10,000. When confronted with the invoice reflecting a $5,000 fee that Ms. Harris produced, respondent admitted that the $5,000 invoice was real. He

claimed that the fee agreement was $5,000 for each criminal charge and that there were actually two invoices for $5,000. However, respondent could not explain why the second $5,000 invoice was lost and could not explain why there would be two $5,000 invoices and also one $10,000 invoice. Respondent further testified that he sent Ms. Harris the $10,000 invoice along with a letter via certified mail. He claimed to have hand-delivered same to Mr. Harris. However, respondent could provide no proof of the certified mailing. Respondent also did not know if he took any action regarding the fee dispute in this matter.

Ms. Harris' testimony was very credible and supported by documentary evidence. She testified that she hired respondent to defend her brother against serious criminal charges. According to Ms. Harris, respondent agreed to represent her brother for $5,000, and she paid him a $1,500 deposit. Eventually, she paid him an additional $3,100. Respondent was reluctant to provide Ms. Harris with receipts and only wanted cash payments. When respondent failed to appear for several hearings, Mr. Harris fired him and filed a disciplinary complaint against him. Mr. Harris also testified that the fee agreement was $5,000 with a payment plan. Both of them denied the fee was $10,000 and denied ever seeing the letter and $10,000 invoice respondent claimed to have delivered to them.

Based upon the testimony and evidence, the committee found respondent was hired to represent Mr. Harris for a $5,000 fixed fee for all criminal charges. Upon being discharged, respondent knowingly and intentionally made no effort to return any portion of the unearned fee or to initiate fee dispute arbitration. Furthermore, respondent created a false $10,000 invoice and letter and presented same to the ODC and the committee. Based upon these facts, the committee determined respondent violated Rules 1.5(f)(5), 8.1(a), and 8.4(c) of the Rules of Professional Conduct.

*The James Matter*

Mr. James testified that he and his co-defendant each hired respondent to represent them for a $6,000 fixed fee. He further testified that $2,000 of the $6,000 was paid upfront on his behalf. Documentary evidence showed that respondent enrolled as Mr. James' counsel on March 13, 2017 and withdrew as his counsel on April 6, 2017 due to a conflict of interest. In his disciplinary complaint against respondent, Mr. James requested a refund.

Respondent admitted that he did not complete Mr. James' case but fixated on his assertion that he had worked between sixty to eighty hours on the case despite filing no other pleadings or making no other court appearances on Mr. James' behalf. In response to Mr. James' complaint, respondent indicated that Mr. James' aunt or grandmother had contacted him about a refund. However, during his testimony at the hearing, respondent testified that Mr. James' family never contacted him about a refund.

Based upon the testimony and evidence, the committee found that Mr. James hired respondent on a fixed-fee basis. Within a month of being hired, respondent had to withdraw due to a conflict of interest. Thereafter, respondent knowingly and intentionally did not take any action to resolve the fee dispute. Based upon these facts, the committee determined respondent violated Rule 1.5(f)(5) of the Rules of Professional Conduct.

*The Contempt of Court Matter*

Judge Garrett testified that she was uncomfortable testifying against respondent because they now have a professional rapport after having started off "slightly rocky." During the September 12, 2017 hearing, Judge Garrett was irritated with respondent for saying he had not had time to read the amended motion. Respondent then told her that he was not going to read the motion in court but would

instead read it at his office where he could conduct research, which she felt was contemptuous. Therefore, she ejected him from the courtroom. The transcript of the hearing at issue indicates that Judge Garrett stated, "Get out. Get out before I put you in jail. Get out. I will pass it temporarily."[5] She felt that her ejection of respondent diffused the situation and gave respondent an opportunity to address the issues in the motion. After reviewing the transcript of the hearing at issue, Judge Garrett also admitted that respondent did not call the prosecutor "crazy." However, when she heard the word during the hearing, she felt her reaction was predictable, and she held respondent in contempt of court the next day.

Caddo Parish Sheriff's Office Captain Sharon Piggs testified that, when Judge Garrett asked that respondent return to the courtroom, she sent a deputy to respondent's office, but respondent's office location had recently changed, and the deputy could not find him. Captain Piggs then sent respondent a text, to which he replied, and she told him that Judge Garrett was looking for him. Respondent indicated that he thought the hearing was finished. However, he did return to the courtroom only to learn that Judge Garrett had adjourned for the day.

Respondent testified that he was not referring to Judge Garrett or the prosecutor as crazy. He also stated that he was not talking to Judge Garrett when he declined to borrow the Code book.[6]

Based upon the testimony and evidence, the committee found that respondent's words, actions, and demeanor during the September 12, 2017 hearing

---

[5] The transcript further reveals that respondent interrupted Judge Garrett several times. Her next statement to respondent after saying, "I will pass it temporarily" was "Do not interrupt me." Judge Garrett further testified that she meant for him to wait outside the courtroom, not leave the courthouse and return to his office. She believed he understood that he should wait outside because she had previously told him to take a moment outside the courtroom to review the motion. Respondent's client, Kenrick Wilson, testified that Judge Garrett told him to sit down after she told respondent to get out of the courtroom. Mr. Wilson indicated that he sat in the courtroom until she recalled the case, but Judge Garrett reset the hearing for the next day because respondent did not return.

[6] Respondent specified during his testimony that he was talking to the prosecutor, who had previously offered to let him use her Code book.

were reckless and challenged Judge Garrett's authority and dignity. Therefore, Judge Garrett found respondent guilty of direct contempt and fined him. Judge Garrett and respondent have not had any problems since. Based upon these facts, the committee determined that respondent negligently committed a technical violation of Rule 8.4(d) of the Rules of Professional Conduct. Because Judge Garrett had already satisfactorily addressed respondent's negligent lapse, the committee declined to consider this matter in determining an appropriate sanction.

The committee then determined respondent violated duties owed to his clients, the legal system, and the legal profession. His conduct was negligent, knowing, and intentional, which caused actual harm to his clients and potential harm to the public, the legal system, and the legal profession. Citing the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension.

In aggravation, the committee found the following: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, submission of false evidence, false statements, or other deceptive practices during the disciplinary process, a refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, substantial experience in the practice of law (admitted 2008), and indifference to making restitution. In mitigation, the committee found the absence of a prior disciplinary record and imposition of other penalties or sanctions (the contempt of court matter only).

After considering this court's prior jurisprudence addressing similar misconduct, the committee recommended respondent be suspended from the practice of law for two years, with all but six months deferred, followed by one year of probation with conditions.

Both respondent and the ODC objected to the committee's report and recommendation.

*Disciplinary Board Recommendation*

After review, the disciplinary board determined that the hearing committee's factual findings are supported by the record and adopted same. Based on these facts, the board agreed with the committee's determination of rule violations, with one exception. In the Kennon matter, the board found an additional violation of Rule 8.4(a) due to respondent's violation of Rules 1.3 and 1.5(f)(5) of the Rules of Professional Conduct.

The board then determined respondent violated duties owed to his clients, the public, and the legal profession. His failure to address the multiple fee disputes was knowing, if not intentional. His submission of a fabricated invoice and letter and fabricated testimony with respect to the Harris matter was knowing and intentional.

Respondent caused harm to several clients by failing to address the fee disputes or to return the unearned fees. Notably, subsequent to the formal hearing, the fee dispute in the Davis matter was submitted to the LSBA fee dispute resolution program, and the arbitrator determined respondent owed Mr. Davis a $4,150 refund. Respondent also harmed Mr. Kennon by failing to perform any services on his behalf. Finally, respondent's fabrication of documents and testimony harmed the integrity of the legal profession and caused potential harm to the disciplinary system.

The board agreed with the committee that the baseline sanction is suspension based upon the ABA's *Standards for Imposing Lawyer Sanctions*. The board also agreed with the committee's determination of aggravating and mitigating factors.

After further considering this court's prior jurisprudence addressing similar misconduct, a majority of the board recommended respondent be suspended from the practice of law for two years, with all but one year deferred, followed by one year of probation with conditions. One board member dissented and would recommend that no portion of the two-year suspension be deferred.

Both respondent and the ODC objected to the board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

**DISCUSSION**

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

The record of this matter supports a finding that respondent neglected a legal matter, failed to address fee disputes in four matters, made false statements and provided false evidence to the ODC during an investigation, and was found in contempt of court for challenging a judge's authority during a hearing. The board's determinations regarding rule violations based upon these facts is supported by the record.

The committee and the board both determined there was not clear and convincing evidence that respondent violated the Rules of Professional Conduct by seeking Mr. Gilliam's signature on the affidavit relating to the representation of Mr. Kennon. However, we find that respondent attempted to persuade Mr. Gilliam to sign the affidavit even though he knew it contained false statements. The committee specifically found that respondent accepted the fee and agreed to represent Mr. Kennon. The affidavit that respondent drafted for Mr. Gilliam's signature

15

specifically stated, "Based on my knowledge, information and belief, Mr. Florence never agreed that he would represent Mr. Kennon in his new criminal charge," which is contrary to Mr. Gilliam's remarks in open court while representing Mr. Kennon, his statements in a motion to continue, and his testimony at the disciplinary hearing. Respondent's attempt to get Mr. Gilliam to sign the affidavit even though he knew it contained this false statement is dishonest conduct in violation of Rule 8.4(c).

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

Respondent violated duties owed to his clients, the legal system, and the legal profession. At times, he acted negligently, knowingly, and/or intentionally, and his conduct caused actual and potential harm. The applicable baseline sanction is suspension. We agree with the aggravating and mitigating factors found by the committee and adopted by the board. In additional mitigation, we agree with respondent that there has been a delay in the disciplinary proceedings.

Turning to the issue of an appropriate sanction, we find that the heartland of respondent's misconduct consists of his numerous failures to address fee disputes and his submission of false statements and false evidence to the ODC. Respondent has never addressed the fee disputes with Mr. Kennon, Mr. Harris, and Mr. James. While he did participate in fee dispute arbitration with Mr. Davis, he did so belatedly and has never provided evidence of the ordered refund to Mr. Davis despite claiming

to have made said refund. With respect to his submission of false evidence and false statements during the disciplinary proceeding, the record is clear that respondent submitted a false invoice and made false statements to the ODC regarding the Harris matter. In the Kennon matter, respondent attempted to submit a false affidavit to the ODC.

Considering all of respondent's misconduct, we will suspend him from the practice of law for one year and one day, thereby necessitating a formal application for reinstatement. Respondent shall make full restitution to Mr. Kennon, Mr. Harris, and Mr. James or participate in the LSBA fee dispute resolution program and pay any amounts awarded to Mr. Kennon, Mr. Harris, and Mr. James in decisions rendered by the fee dispute resolution program. In addition, if he has not already done so, respondent shall pay $4,150 to Mr. Davis, which amount was awarded to Mr. Davis by the LSBA fee dispute resolution program.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that J. Antonio Florence, Louisiana Bar Roll number 32037, be and he hereby is suspended from the practice of law for a period of one year and one day. Respondent shall make full restitution to Keddrick Kennon, Rodriqus Harris, and Cordero James or participate in the Louisiana State Bar Association's Fee Dispute Resolution Program and pay any amounts awarded to Mr. Kennon, Mr. Harris, and Mr. James in decisions rendered by the Fee Dispute Resolution Program. Respondent shall also pay $4,150 to Burney Davis if he has not already done so. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

17